*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 22, 2023

Plaintiff-Appellee,

v

Nos. 356497; 356498
Wayne Circuit Court
LC Nos. 19-004442-01-FC;
20-000327-01-FC

JAMES QUILL COCKERHAM,

Defendant-Appellant.

Before: MARKEY, P.J., and JANSEN and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 356497, defendant appeals by right his jury-trial convictions of first-degree premeditated murder, torture, and unlawful imprisonment. The trial court sentenced defendant as a fourth-offense habitual offender to serve life imprisonment without parole for first-degree murder and concurrent prison terms of 75 to 150 years for torture and unlawful imprisonment. In Docket No. 356498, defendant appeals by right his jury-trial convictions of first-degree felony murder, kidnapping, first-degree criminal sexual conduct ("CSC-I"), and second-degree criminal sexual conduct ("CSC-II"). The trial court sentenced defendant as a fourth-offense habitual offender to serve concurrent prison terms of 75 to 150 years for kidnapping and CSC-II and a consecutive prison term of 30 to 60 years for CSC-I. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from the kidnapping, sexual assault, and homicide of the decedent at the Parkview Towers senior citizens' apartment building in Detroit, Michigan on the night of May 14, 2019. The decedent and her boyfriend were staying with his father in his apartment. The father buzzed her into the building, but she never arrived at the apartment. The decedent's body was discovered in a trash compactor bin the following morning. The prosecutor constructed a chain of events from security camera videos, defendant's cell phone records, and his GPS tether records. The prosecutor also introduced testimony from witnesses who saw blood in a laundry room and trash chute room.

-1-

The evidence at trial showed that defendant and his sister were leaving the Parkview Towers after visiting their mother when defendant saw the decedent in the parking lot. At that point, he told his sister that he was going to stay at the apartments longer. Defendant then waited in the building lobby watching for the decedent to appear. When she did, defendant followed her onto the elevator and overpowered her. Defendant sexually assaulted and battered the decedent in the eighth-floor laundry room. He took her back to the lobby briefly to retrieve her purse and cell phone and then took her to the second-floor trash collection room and pushed her into the trash chute while she was still alive and conscious. She was crushed to death when the attached trash compactor cycled.

The police identified defendant as a suspect from the surveillance videos that showed him waiting for the decedent and following her into the elevator. Defendant's sister and a Parkview Towers security worker saw his picture on the news and contacted the police to identify him. Defendant's presence at Parkview Towers was corroborated by his cell phone records and his GPS tether.

Defendant was found guilty by the jury of first-degree premeditated murder, MCL 750.316(1)(a); first-degree felony murder, MCL 750.316(1)(b); torture, MCL 750.85; kidnapping, MCL 750.349; unlawful imprisonment, MCL 750.349b; CSC-I, MCL 750.520b(1)(f) (sexual penetration accomplished through force or coercion and causing personal injury); and CSC-II, MCL 750.520c(1)(f) (sexual contact accomplished through force or coercion and causing personal injury). The trial court issued a judgment of sentence for each case. The judgment for LC No. 19-004442-01-FC stated that defendant was convicted of first-degree premeditated murder and sentenced to life in prison without parole. The judgment for LC No. 20-000327-01-FC stated that defendant was convicted of first-degree felony murder and sentenced to life in prison without parole. The trial court subsequently issued amended judgments of sentence clarifying that defendant was convicted of one count of first-degree murder on two theories, premeditation and felony murder. The amended judgment for LC No. 20-000327-01-FC listed "no term" for the felony-murder sentence.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was not sufficient to support his conviction of first-degree murder because the prosecutor failed to prove premeditation. Alternatively, he argues that he should be granted a new trial because the verdict for premeditated murder and felony murder was contrary to the great weight of the evidence. We disagree.

## A. STANDARDS OF REVIEW

"This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019) (quotation marks and citation omitted). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of [a] crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks and citations omitted; alteration

in original). This Court "is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id*. (quotation marks and citation omitted).

"A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Evans*, 335 Mich App 76, 87; 966 NW2d 402 (2020) (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id*. (quotation marks and citation omitted). "[A]bsent exceptional circumstances, issues of witness credibility are for the jury." *People v Lemmon,* 456 Mich 625, 642; 576 NW2d 129 (1998).

## B. ANALYSIS

### 1. SUFFICIENCY OF THE EVIDENCE

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Premeditation is not statutorily defined and cannot be evaluated in a rigid and mechanical manner." *Walker*, 330 Mich App at 383. "When first-degree murder is premised on premeditation, the prosecutor must prove that the defendant acted with the intent to kill the victim and must show that he acted deliberately and with premeditation." *Clark*, 330 Mich App at 436. "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *People v Bass*, 317 Mich App 241, 266; 893 NW2d 140 (2016). "Because of the inherent difficulty of proving a defendant's state of mind, only minimal circumstantial evidence from which intent may be inferred need be presented." *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011).

This Court has also held that premeditation may "be established through evidence of . . . (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Walker*, 330 Mich App at 384 (quotation marks and citation omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a second look." *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) (quotation marks and citations omitted). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id*. at 242-243 (quotation marks, citations, and alteration omitted). "The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it." *Id*. at 243 (quotation marks and citation omitted).

The prosecutor introduced evidence that defendant waited in the lobby, watched for the decedent to return, and then waited for her outside the elevator. Defendant's posture and observable behavior showed that he pretended to talk on his cell phone until he had the opportunity to encounter the decedent in the elevator. These actions reflected a plan to isolate himself with the

decedent and attack her. Defendant's conduct in taking the decedent back to the first floor to retrieve her belongings and then subsequently forcing her back into the elevator with him indicated that he had already decided at that moment to take her back to an upper floor to kill her. The unusual manner in killing—pushing the decedent down a trash chute—also demonstrated that defendant thought about how he would dispose of the decedent after sexually assaulting her. Viewing the evidence in the light most favorable to the prosecution, this evidence was sufficient to support a finding of premeditation.

## 2. GREAT WEIGHT OF THE EVIDENCE

Alternatively, defendant contends that the first-degree premeditated murder and felony-murder convictions were against the great weight of the evidence. Defendant argues that the medical examiner, Dr. Milad Webb, determined that the decedent died at 12:16 a.m., more than an hour after defendant left the building. This statement misrepresents Dr. Webb's testimony. Dr. Webb estimated that the decedent died between 10:00 p.m. and 11:00 p.m. Defense counsel attempted to impeach Dr. Webb with his preliminary examination testimony in which he stated that the death might have occurred as late as 12:16 a.m., but in response Dr. Webb explained the variables that entered into the approximation of a time window in which death occurred. Moreover, Dr. Webb determined that the decedent was alive in the trash compactor until it cycled. If the decedent died more than an hour after defendant pushed her into the chute, this information would not exonerate defendant from causing her death.

Defendant's additional arguments regarding the weight of the evidence are without merit. Defendant suggests that building employees denied seeing blood in the second-floor laundry room when they made periodic checks of the building on the night of the murder. He states that the earliest discovery of blood occurred at 3:30 a.m. The second-floor laundry room was not involved in this case. Blood was found in the eighth-floor laundry room and the second-floor trash room. Moreover, the testimony did not establish that blood in these rooms was not discovered until 3:30 a.m. A security worker testified that he saw blood on the eighth floor between 11:30 p.m. and midnight and that he did not see anything in the second-floor trash room. However, he did not remember which floors he checked. The site supervisor testified that he checked all 12 floors with a police officer but he did not affirmatively state that he actually looked into every trash and laundry room.

In sum, the prosecutor presented sufficient evidence that defendant committed first-degree premeditated murder and felony murder. These convictions were not against the great weight of the evidence and, therefore, we affirm them.

## III. PROSECUTORIAL ERROR

Next, defendant argues that the prosecutor made improper and prejudicial statements urging the jury to sympathize with the victim and denigrating defendant's character. Alternatively, defendant contends that his attorney was ineffective for failing to object to the prosecutor's statements. We disagree.

## A. STANDARDS OF REVIEW

-4-

"To preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021) (quotation marks, citation, and alteration omitted). Defendant did not object to the allegedly improper statements and, therefore, did not preserve this issue. Claims of prosecutorial error are reviewed to determine whether the defendant was denied a fair and impartial trial. *People v Loew*, 340 Mich App 100, 125; 985 NW2d 255 (2022), lv gtd ___ Mich ___; 979 NW2d 851 (2022). "The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *Bennett*, 290 Mich App at 475. "Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting substantial rights." *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011).

## B. ANALYSIS

### 1. IMPROPER PROSECUTORIAL STATEMENTS

"A prosecutor's role within our judicial system is to seek justice and not merely to convict." *People v Meissner*, 294 Mich App 438, 455; 812 NW2d 37 (2011). "Prosecutors have discretion on how to argue the facts and reasonable inferences arising therefrom, and are not limited to presenting their arguments in the blandest terms possible." *Id*. at 456. "A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial." *Id*. (quotation marks and citation omitted). "[P]rosecutors may use 'hard language' when it is supported by evidence . . . ." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). "Emotional language may be used during closing argument and is an important weapon in counsel's forensic arsenal." *Id*. at 679 (quotation marks and citation omitted). However, "[a] prosecutor may not appeal to the jury to sympathize with the victim. . . . Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). "[I]f counsel exceeds the proper bounds of argument, a judge should interrupt to correct counsel and to take any curative measures that are necessary." *Ullah*, 216 Mich App at 679. "[A] well-tried, vigorously argued case ought not be overturned because of isolated improper remarks that could have been cured had an objection been lodged." *Id*.

The statements that defendant deems unacceptable were related to the charge of torture. Torture is defined by MCL 750.85, which states in relevant part:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

(2) As used in this section:

(a) "Cruel" means brutal, inhuman, sadistic, or that which torments.

(b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.

(c) "Great bodily injury" means either of the following:

(*i*) Serious impairment of a body function as that term is defined in section 58c of the Michigan vehicle code, 1949 PA 300, MCL 257.58c.

(*ii*) One or more of the following conditions: internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds.

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

(*i*) The intentional infliction or threatened infliction of great bodily injury.

(*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

(3) Proof that a victim suffered pain is not an element of the crime under this section.

The prosecutor stated that defendant "preyed" on the decedent, who "fought for her life." Noting that the evidence showed it took three minutes for the trash compactor to kill the decedent while she was still alive and conscious, the prosecutor asked the jury to "[s]it in silence for three minutes and think about this beautiful, young woman lying there in a fetal position with her neck broken, with her ribs crushed, with head injuries, facial injuries." Remarking on the sexual assault and battery the decedent suffered before being placed in the compactor, the prosecutor stated "[i]t was a nightmare," and asked the jury to "think about the last 20 minutes of her life."

The prosecutor's descriptions of the victim's terror and agony were appropriate because they relate directly to the proofs required for a conviction of torture. It was not sufficient for the prosecutor to prove that defendant imprisoned and sexually assaulted decedent and then left her to die alone. The prosecutor was required to demonstrate to the jury that defendant acted "with the intent to cause *cruel* or *extreme* physical or mental pain and suffering," and that he inflicted "*great* bodily injury or *severe* mental pain or suffering." To prove cruel intent, the prosecutor had to show that defendant intended to cause physical or mental pain and suffering that was "*brutal, inhuman, sadistic* or that which *torments*." To prove that defendant inflicted "severe mental pain or suffering," the prosecutor had to show that the victim sustained "a mental injury that results in

*substantial alteration of mental functioning*" that was caused by or resulted from, for example, intentional infliction of great bodily injury. The statute contemplates proof of conduct that is extraordinary and shocking, not merely harmful. The prosecutor's statements emphasizing that the decedent spent 20 minutes enduring defendant's physical and sexual abuse under defendant's control, followed by several minutes of helpless isolation in a trash bin, were not gratuitous hyperbole. They were directly related to the proofs required by the statute. Defendant therefore fails to demonstrate that the prosecutor improperly appealed to the jury's sympathy.

Defendant unconvincingly compares the prosecutor's statements to statements found to be unfairly prejudicial in *People v Dalessandro*, 165 Mich App 569; 419 NW2d 609 (1988).[1] In that case, the defendant was convicted of assault with intent to do great bodily harm less than murder and child torture, arising from physical abuse of the defendant's girlfriend's 10-month-old son. *Id*. at 571. The prosecutor made improper comments to the jury, "constantly referring to 'the poor innocent baby.' " *Id*. at 581. Thus, the Court found troubling the fact that "the prosecutor was injecting the element of sympathy for [the victim] into the case." *Id*.

Unlike *Dalessandro*, the prosecutor did not improperly ask the jury to sympathize with the decedent. Rather, the prosecutor recounted the evidence—in strong terms—that was required to prove defendant tortured the victim. It may be that by describing the evidence, the jury sympathized with the decedent. But this was not improper. *Dalessandro* is equally unpersuasive because crucial to this Court's opinion that defendant's convictions be reversed was the fact that the prosecutor "suggested to the jury that defense counsel was intentionally trying to mislead the jury." *Id*. at 580. No such statements occurred in this case.

Defendant also cites *People v Swartz*, 171 Mich App 364, 367; 429 NW2d 905 (1988), in which the defendant sexually assaulted a corrections officer at the prison where he was incarcerated. While we concluded that the prosecutor's remarks during opening and closing statements were improper because they "appear[ed] to be improper appeals to the jury for sympathy," we concluded that the statements were "not . . . grounds for a new trial because their prejudicial effect could have been cured with a timely requested cautionary instruction." *Id*. at 372-373. Similarly here, even if the statements made by the prosecutor were improper—they were not—defendant failed to timely request a cautionary instruction, which would have alleviated any prejudicial effect.

Defendant also argues that the prosecutor improperly denigrated him by referring to him as a predator waiting for prey. "[P]rosecutors should not resort to civic duty arguments that appeal to the fears and prejudices of jury members or express their personal opinion of a defendant's guilt, and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda*, 448 Mich 261, 282-283; 531 NW2d 659 (1995). "Such comments during closing argument will be reviewed in context to determine whether they constitute error requiring reversal." *Id*. at 283. The prosecutor's descriptions of defendant as a "predator" seeking out his "prey" were supported by the evidence. Defendant contrived an excuse to return to the building after he saw the decedent outside the building. He then employed a ruse by waiting in the lobby

---

[1] Cases from this Court decided before November 1, 1990, are not binding but may be considered for their persuasive value. *People v Vandenburg*, 307 Mich App 57, 66 n 2; 859 NW2d 229 (2014).

-7-

where he could watch for the decedent's return. Having employed the ruse, defendant used the opportunity to get into the elevator with the decedent where he then abducted her. These actions can be fairly described as predatory and were not denigrating.

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that if this Court determines that the prosecutor's remarks do not constitute error because defendant failed to request a cautionary instruction, this Court should conclude that he was denied the effective assistance of counsel.[2] "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). Defendant fails to satisfy these requirements because the remarks were not improper. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Defendant also fails to establish grounds for a *Ginther* hearing because this issue arises solely from the prosecutor's argument in the trial record.

## IV. DEFENDANT'S STANDARD 4 BRIEF

### A. FABRICATED EVIDENCE

Defendant asserts that his right to due process was violated by the prosecutor's introduction of fabricated evidence. This issue is not preserved, as defendant failed to raise any objections on grounds of fabrication at trial. Due-process claims are reviewed de novo on appeal, but unpreserved claims of constitutional error are reviewed for plain error affecting the defendant's substantial rights. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009); *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).

Defendant makes several factual assertions that are not supported by the record. Defendant accuses law enforcement officers of fabricating evidence by putting the victim's blood on his boots and by transferring sperm cells from his bed onto rape kit swabs, but he did not make these assertions at trial or introduce witnesses to testify in support of his accusations. Defendant states that Dr. Julie Howenstine of Speckin Forensics independently analyzed DNA evidence and made findings contradicting the prosecution experts' findings, but Dr. Howenstine did not testify, nor was her report admitted into evidence. There is no basis for finding that the prosecutor introduced fabricated evidence. This argument is, therefore, without merit.

---

[2] If the defendant did not move for a new trial or for a *Ginther* hearing, this Court's review of a claim of ineffective assistance of counsel "is limited to mistakes apparent on the record." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Neither the trial court nor this Court granted defendant's motion for a *Ginther* hearing. Review of this issue is therefore limited to mistakes apparent on the record.

-8-

B. TRANSCRIPT TAMPERING

Defendant also argues that the trial transcripts contain alterations of witness testimony. He asks this Court to remand to the trial court to allow him to review the court reporter's notes and audio recordings.

In *People v Abdella*, 200 Mich App 473, 474; 505 NW2d 18 (1993), the defendant was convicted of burning a dwelling-house, but he was partly successful in his appeal to this Court. The defendant then moved in the trial court to listen to tape recordings of the trial, alleging that a portion of a witness's testimony was omitted from the transcript. *Id*. at 474-475. The trial court denied the motion on the ground that the defendant had failed to indicate "what exactly is omitted and what impact the omitted information may have [had]." *Id*. at 475 (quotation marks omitted; alteration in original). The trial court further stated that granting the defendant's motion to enable him to pursue his claim of an inaccurate transcript would undermine "the entire purpose of requiring court reporters to be certified" and "constitute a very serious threat to judicial economy, efficiency and resources." *Id*. (quotation marks omitted).

This Court disagreed with "the trial court's assertion that certified records of proceedings are irrebuttably accurate." *Id*. This Court held that when a defendant "is able to make a colorable showing that inaccuracies in transcription have adversely affected the ability to secure postconviction relief, and such matters have seasonably been brought to the trial court's attention, the defendant is entitled to a remedy." *Id*. at 475-476. The Court established four requirements for a defendant to "overcome the presumption of accuracy and be entitled to relief." *Id*. at 476. To fulfill these prerequisites, the defendant must: "(1) seasonably seek relief; (2) assert with specificity the alleged inaccuracy; (3) provide some independent corroboration of the asserted inaccuracy; [and] (4) describe how the claimed inaccuracy in transcription has adversely affected the ability to secure postconviction relief pursuant to subchapters 7.200 and 7.300 of our court rules." *Id*.

Defendant cannot establish the prerequisites we outlined in *Abdella*. Arguably, nine months after the trial to raise the issue was not an unreasonable delay. However, defendant did not "assert with specificity the alleged inaccuracy." *Id*. at 476. Defendant argued in conclusory fashion:

> 8. Mr. Cockerham contends the testimony of Amber Young and Kathleen Gill was totally fabricated. A work of fiction.

> 9. Mr. Cockerham also contends that the testimonies of Tierra Davis, Ricardo Karl Kimpson, Jennifer Jones, Milad Webb, Jason Mays and Ozzie Perry was altered.

Defendant also did not provide independent corroboration of the claimed inaccuracies. Lastly, defendant made only the general conclusory statement that the "material inaccuracies in the transcription . . . has adversely affected his ability to secure state appellate relief or federal relief."

On appeal, defendant attempts to rectify these deficiencies with a more detailed statement of the alleged inaccuracies and an affidavit provided by his uncle. Generally, parties cannot

expand the record on appeal. *Nix*, 301 Mich App at 203. Parties also may not "enlarge the record on appeal by the use of affidavits." *People v Williams*, 241 Mich App 519, 524 n 1; 616 NW2d 710 (2000). Defendant's belated attempts are, therefore, ineffective. Finally, defendant still fails to state how the alleged omissions prejudice his rights on appeal. Unlike the defendant in *Abdella*, who alleged that exculpatory testimony was omitted, defendant does not state that any materially exculpatory testimony was altered. None of the alleged alterations in the transcripts pertain to the video evidence, DNA evidence, cell phone records, or GPS tether data. Defendant therefore is not entitled to access to the audio recordings and reporter's notes.

## C. DOUBLE JEOPARDY

Defendant also argues that the constitutional guarantee against double jeopardy, US Const, Am V; Const 1963, art 1, § 15, precludes his conviction of both first-degree premeditated murder and first-degree felony murder for a single homicide. He contends that this guarantee entitles him to vacation of his conviction of the predicate felonies of kidnapping and criminal sexual conduct. Defendant's first claim of error is moot because the trial court amended the judgments of sentence to reflect one conviction of first-degree murder, on two theories. Defendant withdrew his argument regarding the predicate felonies in the trial court, and therefore waived it for appeal. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error.") (quotation marks and citation omitted). In any event, conviction of felony murder and the predicate felonies does not violate the Double Jeopardy Clause because kidnapping and CSC include elements that are not elements of murder. See *People v Ream*, 481 Mich 223, 225, 241-242; 750 NW2d 536 (2008); *People v Jaffray*, 445 Mich 287, 296-297; 519 NW2d 108 (1994); MCL 750.520b; MCL 750.520c.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant asserts multiple claims of ineffective assistance of counsel related to failure to challenge Dr. Webb's testimony and failure to call witnesses whose testimony would have undermined the prosecution theory. The trial court did not conduct a *Ginther* hearing, so our review is limited to facts apparent on the record. *Petri*, 279 Mich App at 410.

Defendant argues that trial counsel was ineffective in failing to call his parole agent as an alibi witness, failing to retain an expert witness, and failing to call a witness who would have testified regarding domestic violence and volatility in decedent's relationship with her boyfriend. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy. A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (citation omitted). "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Id*. (quotation marks and citation omitted). "In general, the failure to call a witness can constitute ineffective assistance of counsel only when it deprives the defendant of a substantial defense." *Id*. (quotation marks and citation omitted). Failure to call an alibi witness does not constitute ineffective assistance unless the defendant can establish that the witness would have given favorable testimony. *People v Pickens*, 446 Mich 298, 327; 521 NW2d 797 (1994). The defendant

must offer proof "that an expert witness would have testified favorably if called by the defense." *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003).

There is no record evidence that defendant would have found an expert witness who would have testified favorably on either DNA identification or the decedent's time of death. There also is no evidence that an alibi witness would have testified favorably for defendant. Additionally, evidence that the decedent died later than Dr. Webb opined and alibi testimony that defendant was at a different location when she died would not have been a substantial defense, because the evidence demonstrated that the decedent died sometime after she was placed in the trash compactor. Testimony that this happened later than Dr. Webb determined, or that defendant was far away from the building when this happened, would not have provided a substantial defense. The decedent died because defendant pushed her into the compactor, regardless of how long it took or how far defendant traveled. Defendant, therefore, fails to establish that trial counsel was ineffective by failing to present expert testimony or alibi testimony, or that such testimony might have led to a more favorable outcome. He also fails to overcome the presumption that counsel exercised strong strategy with respect to choice of witnesses.

Defendant argues that counsel should have cross-examined Dr. Webb more intensely, especially with respect to his estimation of the time of death. The manner of cross-examination is a matter of strategy. *Petri*, 279 Mich App at 413. However, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *Lane*, 308 Mich App at 68. Trial counsel vigorously cross-examined Dr. Webb about discrepancies between his trial testimony and preliminary examination testimony. Defendant fails to demonstrate that trial counsel's approach to cross-examination was unsound. Defendant also argues that trial counsel missed opportunities to shift blame to the decedent's boyfriend. He states that a witness would have given testimony supporting this theory. Defendant's description of this witness's encounter with the boyfriend is vague, but in any event, there is no record evidence concerning what knowledge this witness had or how he would have testified.

Affirmed.

/s/ Jane E. Markey
/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly